William F. Brase, Appellant, v. Chicago Union Traction Company, Appellee.

Gen. No. 13,935.

1. INSTRUCTIONS—*what essential to justify pcremptory.* It is not proper to take a case from the jury unless there is no evidence which with all the inferences and intendments reasonably to be drawn from it would support a verdict for the plaintiff.

2. MASTER AND SERVANT—*what essential to establish liability of former to latter caused by defective appliances.* Three things must concur to render a master liable for an injury caused by a defective appliance: (1) the appliance must have been defective; (2) the master must have had knowledge or means of knowledge, which should have been used, of the defect; and (3) the servant must not have known of the defect or have had equal means of knowledge with the master,—exceptions to the last condition existing in certain cases, of emergent special orders, unredeemed promises to repair, and immaturity or inexperience with machinery or complicated devices, etc.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. BEN M. SMITH, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed July 6, 1908.

Statement by the Court. This is an appeal from a judgment by the Superior Court of *nil capiat* and for costs rendered against the plaintiff, William F. Brase, and in favor of the defendant, the Chicago Union Traction Company, on June 15, 1907.

The suit was in case for personal injuries caused by the negligence of the defendant. It was begun on February 3, 1903, and came to trial before a jury on April 15, 1907.

There were four counts in the original declaration and one additional count filed thereafter by leave of court.

The plaintiff discontinued on the second, third and fourth counts before the trial, and left the first original count and the additional count as the statements of his cause of action.

The first count avers that the defendant was on December 16, 1902, the owner and operator of certain street cars in Chicago, propelled by electricity, and that the plaintiff was on that day in the employ of defendant as a conductor on one of its cars operated on its tracks on East Van Buren street. That amongst the other duties imposed upon the plaintiff by the said defendant "was the duty of aiding and assisting in starting, moving and pushing certain heavy wagons, trucks or vehicles which might become stalled or stuck on the inclines or approaches to viaducts and bridges on which the tracks of said defendant ran, by means of a certain appliance of wood or other material, which said appliance the plaintiff, in the discharge of his duties as conductor, was required to place against the said vehicles, trucks or wagons so stalled or stuck as aforesaid, and the front end of the car in charge of the plaintiff as conductor, so that the said truck, wagon or vehicles might be forced or shoved ahead by means of the electric power of said car;" that it was the duty of the defendant to furnish the plaintiff a safe place to work and reasonably safe and fit appliances with which to perform his duties, and to order and direct the work of the plaintiff to be done in such manner as would be reasonably safe for plaintiff; that nevertheless, while the plaintiff was discharging his duties as servant of the defendant under its orders and using due care for his own safety, and was aiding and assisting in moving and starting a certain heavy wagon which had become stalled on the east approach to the Van Buren street bridge, and had placed the rear end of said wagon and the front end of the car in charge of the plaintiff a certain piece of wood furnished and supplied for that purpose by the said defendant, the defendant negligently furnished and kept for the use of its conductors at the east approach to said bridge a piece of wood which had become old and battered at the ends and unfit for the purposes to which it was applied; by means of all which and the unsafe and

unfit appliance so furnished, when the electric force was applied to the said car the said piece of wood slipped from its place, and allowed the car and wagon to come together with great force and violence, so that the plaintiff was caught between the same and greatly injured.

The additional count avers that the defendant negligently ordered the plaintiff to use and take a certain wooden stick or appliance and to place it against the front of the car and a certain heavy wagon and to push said wagon up the incline of the bridge, and that said stick, on account of its shape, size, construction and material and worn and slippery condition, was inadequate, unfit and unsafe to be used for such purposes, and that the dangers thereof were unknown to the plaintiff and well known to, or by reasonable care ascertainable by, the plaintiff. It also avers that the said stick slipped, fell out and dropped from between the car and the wagon, on account of its inadequate and unfit shape, size, construction, material and worn and slippery condition, and the plaintiff was thereby caught between the car and the wagon and grievously injured.

The general issue was pleaded to both these counts. At the trial, after the evidence for the plaintiff had been heard, the defendant moved the court to exclude from the jury all the evidence on behalf of the plaintiff and to instruct the jury to find the defendant not guilty. This motion was allowed by the court and the jury were so instructed, and a verdict returned in accordance with the instruction.

A motion for a new trial was made and overruled, and judgment was entered on the verdict. From this judgment the plaintiff appealed to this court and in this court has assigned the peremptory instruction, the entry of the verdict and of the judgment, and the denial of the motion for a new trial for error.

JAMES MAHER, for appellant.

John A. Rose and Frank L. Kriete, for appellee; W. W. Gurley, of counsel.

Mr. Justice Brown delivered the opinion of the court.

We cannot reverse the action of the court below in this cause. We can only see a very sad and unfortunate accident, for which the defendant cannot, within the acknowledged principles of the law, be held liable.

The injuries which the plaintiff suffered, including the loss of one leg and the permanent crippling of another, as they did, cannot but excite the compassion of all who hear of it; nevertheless it seems to us very clear that the misfortune is one for which he cannot recover unless the defendant is to be considered an insurer of the safety of its servants in all the duties which they may be performing under its direction.

The plaintiff in this case—a man then thirty-one years of age—was at the time of the accident a conductor in the employ of the defendant. He had been so for a year and three months, and for ten months had been on the same regular run. It frequently happens that the street cars are delayed at the approaches to the bridges in Chicago by wagons or trucks or other vehicles which find the grades too steep for an easy ascent. They are on the tracks and becoming thus stalled or stuck, obstruct the passage of the cars. It is the custom in such cases, when other means are unavailing, to use the electric motive power of the obstructed car to assist the intervening vehicle, whatever it may be, up the incline. This is done generally by placing a stick made of hard wood, several feet long, between the front of the car—the bumper so-called— and the rear of the wagon, and thus utilizing the power which propels the car to push the wagon and aid the horses in overcoming the ascent. The run which the plaintiff had was on Van Buren street, where there is a bridge with a moderate ascending approach on each side. When the barn-boss first set the plaintiff to

work as a "student" conductor, as the new men who are being broken in as employes are called, he went with other conductors on various streets. In Kedzie avenue he was told by the conductor he was working with or under, on an occasion when an ash wagon was in the way of the car, to get a stick and push the wagon out of the track, but he says "the company furnished no stick on Kedzie avenue." On other occasions, he says, he was taught by the conductors that he ran with as a student, whenever a wagon or anything was stalled in front of a car, to push it out so that the car could proceed. At one time, about a month before the accident, the barn boss happened to be with the plaintiff when he was approaching with his car, on the west side of the river, the bridge at Van Buren street. There was an empty box wagon stalled there, and the boss pointed out a stick that lay on the bridge and told the plaintiff to "Get the stick and give them a push;" that stick was a little over four feet long, 6 or 8 inches wide and two inches thick, but had no handle or other appurtenances to it. This was not, however, the only time certainly, and presumably not the first time, that the plaintiff had used this method of aiding a stalled wagon at that point up the incline, for he had been running the car there for several months preceding, and he says that he had several times before the accident done this thing at the west approach of the bridge, although he had never had occasion, so far as he could recollect, to do it on the east side of the river.

On the 16th of December, 1902, the day of the accident, he came with his car, going westward to the east approach of the bridge. While he was collecting fares the motorman called his attention to a loaded wagon stalled on the incline. He got off the car, he says, "seeking a stick of wood that he knew to be there." He could not at first find it, and looking about saw a piece of railroad iron about five feet long. He tried to get that in between the car and the wagon, but it

was too heavy. Then his attention was called to a stick which he says came from the Madison street general repair shop, which was lying near. This stick was of oak, and was from 3 to 4 feet long (the plaintiff in one place, however, says six), with a notch in the end of it, and with a copper handle attached to it by which it could be lifted, the handle being like a door handle through which the hand could be inserted. He says it was "in bunged up shape," by which he says he means that the ends were bruised and splintered, as the faces of a wooden mallet would be that had been used to hammer with. The stick looked old, and, lying outside, was wet, and on one end covered with a slight film of ice. He first used this stick as a block under one of the back wheels of the wagon, so as to prevent the wagon sliding back if the teamster could make his horses get the front wheel on to the bridge. This, he says, cleared the end of the ice that was on it. He found that this did not work, however, and then placed the stick between the bumper of the car at the center and the rear of the wagon. He describes what then took place thus:

"Before making a direct impact so that the car and the wagon would be tense with the stick, it took two or three trials and finally the car and the wagon became tense, and the driver of the wagon drove his horses onward—told them to 'get up,' as drivers do, and the motorman—I told him to come on, and he came on and turned on one point of the current as they call it, and while he was doing that, all of a sudden there was a give upward and outward, and I attempted to hold it down with all my strength and weight, and I couldn't do it. When I saw it was going to give I made a jump outward and away from it and I could not make it and I was caught in between the car and the wagon."

The direct examination proceeded:

"Q. What do you mean by giving, when you saw it was going to give? A. There was kind of like a bend.

I caught here (indicating) with my hands, and lower than that center business there. (Illustrating.) There was a kind of a bend in a slant-wise direction, partly outward and partly up. I could not hold it down—it was coming upward and outward and sideways.

"Q. Slipping out? A. Yes, sir, kind of slipping and bending.

"Q. Then what happened? A. Then I got caught between the car and the trucks of the wagon."

On cross-examination the plaintiff further explained that he went between the car and the wagon three times; once with the iron rail, once in an unsuccessful attempt to put the stick between the wagon and the car, and for the third time, when he did it; and that when he told the motorman to "come on" and the current was turned on, he was standing on the fender of the car. He stood there until he was caught and crushed with such distressing results.

Before the stick slipped out the wagon had been moved, but not to exceed nine or ten feet. He says there was no other way to get the stick in that he knew of than to go in with it as he did. The stick when it slipped out fell down alongside the car and the plaintiff never saw it again. He testified that he had no means of obtaining it and did not know where it was.

Another eye-witness of the accident was produced as a witness by the plaintiff—a policeman named King. He was standing by the side of the motorman inside of the front vestibule of the car against the window. He says the conductor took the stick and placed it between the car and the wagon and told the motorman to come on; that "they started up the grade—started to shove the wagon, and had got up a little piece when the stick slipped and the car caught the conductor." He says that the stick seemed to be "frayed a little" at both ends as though it was pounded or used, "as though the ends had been worn and were rough"—like a mallet which had driven a stick into the ground, he explained.

This witness testified also that a one-horse wagon drove in ahead of the heavy wagon as it was being pushed up the grade, and as the one-horse wagon drove in the horses on the heavy wagon shied a little to the north—two or three feet—and that was when the stick slipped off, the west end of the stick going to the south. He thinks the heavy wagon at this time had been pushed but five or six feet up the incline.

It was on this state of facts, as shown by the evidence, that the trial court took the case from the jury. We do not see how, acting in consonance with recognized legal rules, it could have done otherwise.

There is no difference between the parties about the rule applicable. It has often been laid down and is now established beyond question in Illinois, that it is not proper to take a case from the jury unless there is no evidence which, with all the inferences and intendments reasonably to be drawn from it, would support a verdict for the plaintiff.

But the defendant claims that in this case this condition is met, and we are forced to agree with it, despite the natural sympathy which all must feel for the unfortunate plaintiff.

The law has been laid down in this state in many cases—which it is not necessary to cite, so well recognized is the rule—that three things must concur to render a master liable for an injury caused by a defective appliance: (1) That the appliance was defective; (2) that the master had knowledge or means of knowledge, which should have been used, of the defect; and (3) that the servant did not know of the defect or have equal means of knowledge with the master; exceptions to the last condition perhaps existing in cases of emergent special orders, unredeemed promises to repair, and immaturity or inexperience with machinery or complicated devices, et cetera.

In the case at bar these conditions were not met. The plaintiff was a man of maturity, certainly of average intelligence (his testimony would seem to indicate

of more than usual mental calibre), the appliance complained of was of the simplest possible kind, with any defect, if defect there could be said to be, entirely and perfectly obvious, with no latent flaw or imperfection proven in it. It is indeed argued that the stick "bent," and that this showed such an imperfection; but the evidence which we have detailed certainly does not show such a bending or buckling of the wood as indicated any inherent defect of fibre. The stick slipped from the place in which it was placed evidently from some other cause than any actual weakness or pliability. If it was the roughness or splintering of the ends (although it is hard to see how this could have affected the matter), that was obvious; if it was the swerving of the horses of the wagon, which seems more probable, that was not the defect of the appliance. But even if it were inherent pliability of the fibre of this simple oak stick, how could the defendant be presumed to know better than the plaintiff the danger?

Indeed, except so far as the general order to carry his cars through on schedule time implied it, there was no order, general or special, as we view it, to use this particular appliance. It seems to have been put on the bridge by the company to accommodate its employes in cases where such adventitious aid might be required in the performance of their general duties; but the precise times and manner in which it should be used, if at all, must necessarily have been left to the judgment of those employes respectively, in view of the incessant change and variety of circumstance attending a block at a bridge. All kinds of vehicles, of all kinds of shapes, weight and motive power, and in all sorts of weather and condition of the tracks and the street, are likely to be crossing the bridge while the car is attempting to do so, and may by stalling become obstructions to the latter.

The directions in such cases "to get the stick and give a push" are not in reason to be taken as a bind-

ing order on the car conductors which deprives them, as at the special command of a master, of the free use of their own judgments as to employing that particular method of relief. That the plaintiff did not so consider it in the present case is plain from his first attempting to use an iron rail to serve his purpose, and afterwards using the stick, not to push with, but as a "rider" to block the wagon wheel.

Nor was it necessary or a part of his instructions in any view of the matter, that he should stand on the fender of the car for an instant after the power was applied.

We do not think that the citations of car coupling cases and others made by appellant are in point in the case at bar, and we affirm the judgment of the Superior Court.

*Affirmed.*